[No. 8643-7-III.    Division Three.    November 8, 1988.]

JOHN DOES, *Appellants,* v. COMPCARE, INC., *Appellant,*
GERALD L. FREY, ET AL, *Respondents.*

*Jeffrey L. Supinger, Lynn E. McKinney,* and *Witherspoon, Kelley,* for appellant CompCare, Inc.

*Richard E. Lewis, Humphries, Patterson & Lewis, Carole C. Hemingway, Dean, Smith & Hemingway, Keith Moskowitz, Jay Janecek, Ford, Nees & Nordstrom, Thomas V. Cassis, Gary J. Gainer, Richter, Wimberley, Ericson, Mark E. Vovos,* and *David Wood,* for appellants Doe.

*Timothy P. Cronin* and *Mullin, Etter & Cronin,* for respondents Frey, et al.

*Ronald Lane Fontenot,* pro se.

GREEN, J.—This action was brought by eight adolescent males and one adult male alleging sexual abuse by Father Ronald Fontenot while he was employed by Deaconess Hospital and CompCare, Inc., in Spokane. The Diocese of Lafayette, Louisiana, its bishop and vicar general, Bishop Frey and Monsignor Larroque (collectively referred to as the Diocese), were also named as defendants. Plaintiffs allege the Diocese maintained and negligently supervised its priest during his residence at the Jesuit House in Spokane. The Diocese moved to dismiss for lack of in personam jurisdiction. This motion was granted. Plaintiffs' and

CompCare's motion to vacate that decision was denied and they appeal.

The only issue on review is whether there is jurisdiction over the Diocese. We answer in the affirmative and reverse.

The Diocese is a Louisiana corporation located in south central Louisiana. Father Fontenot was ordained as a priest by the Diocese on December 6, 1975. On January 18, 1984, the Diocese suspended him from his priestly duties after he admitted to sexual misconduct with minors. In addition, Father Fontenot was asked to leave the Diocese and enter a treatment facility. Monsignor Larroque made arrangements for Father Fontenot to be evaluated by the House of Affirmation in Massachusetts. The Diocese offered Father Fontenot the option of residing at the Covington Monastery in Louisiana until he could be evaluated, but he requested residence at the Jesuit House in Spokane where he had stayed while studying for his master's degree at Gonzaga University. Monsignor Larroque accepted the Jesuit House as a viable temporary residence where Father Fontenot "could be in an atmosphere that would either support him or, in a sense, keep him from . . . being involved with young people." As the Monsignor stated in his deposition:

> Because of the nature of the complaints, we did not want to take any chances of him just running free. We had no police control over him. We could not lock him up or anything like that. So, we had to have him into a place where he could have some supervision and a place to stay.

Father Fontenot made arrangements to come to Spokane, arriving on January 19. The Diocese paid his transportation expenses and made arrangements with the Jesuit House to pay for his room and board while he resided there. The Diocese continued paying Father Fontenot's salary for 3 months; thereafter it paid him a subsidy for incidental and other living expenses.[1]

---

[1]There is some dispute as to whether the money paid to Father Fontenot was a salary or subsidy. There is also evidence in the record to suggest it may have been a salary.

After he arrived at the Jesuit House, Father Fontenot told the rector about his suspension and the reason for it. The Jesuit House then contacted Monsignor Larroque to confirm the acceptance of Father Fontenot and during that conversation Father Fontenot's sexual problems were discussed. Father Fontenot went to Dr. McAllister, a Spokane psychiatrist, for treatment. Monsignor Larroque made arrangements for the Diocese to pay for this treatment. Dr. McAllister and the Diocese were in contact with one another regarding Father Fontenot's treatment. He was under Dr. McAllister's care until May when he entered the House of Affirmation.

Father Fontenot was a patient at the House of Affirmation from May until November 27, 1984. Shortly before his discharge, the Monsignor wrote him a letter indicating his options for a position in any ministry were "severely limited if not nil":

> Besides the necessary information on the circumstances which led you to the House of Affirmation, your involvement in a possible lawsuit if only indirectly would also have to be disclosed. Because of the possibility of legal action and responsibility on [the] part of any institution that might hire you, I think realistically that for Church employment you are a very poor risk. This is very sad to say and I know that it hurts, but I would be less than honest to give you other hopes. It is also clear that the suspension must remain in force and that you should not be engaged in any priestly functions after you leave the House of Affirmation.

In that letter, the Monsignor told Father Fontenot that additional instances of his sexual misconduct had been brought to light and, consequently, he should not return to the Diocese. Monsignor Larroque further indicated the Diocese could find another residence for him until the situation could be assessed.

The Diocese received a copy of Father Fontenot's discharge summary from the House of Affirmation which stated in part:

Because of a long pattern of secrecy and denial concerning his sexual behavior, it is important that he discuss this problem with those in authority and that for the protection of himself and adolescents that he refrain from ministry that would involve work with adolescent boys.

Following his discharge, Father Fontenot briefly returned to Louisiana and discussed his situation with the Monsignor. He returned to the Jesuit House in January 1985. The Diocese continued to pay his subsidy/salary, Dr. McAllister for continued treatment, and the Jesuit House for his living expenses.

Shortly thereafter Father Fontenot applied to the Spokane Diocese for priestly faculties. The Spokane Diocese contacted the Lafayette Diocese about lifting the suspension, during which a discussion ensued about the liability Father Fontenot posed. The Lafayette Diocese decided not to lift the suspension and, consequently, the Spokane Diocese did not grant Father Fontenot priestly faculties.

In March the rector of the Jesuit House telephoned the Monsignor to find out how much longer Father Fontenot would be residing there and was told the Diocese wanted to wait until some of the other liability cases in Louisiana were settled before giving Father Fontenot a further assignment. During a telephone conversation with Father Fontenot that spring, the Monsignor indicated that once he became self–supporting, the subsidy would eventually be discontinued.

In May Father Fontenot was employed by Deaconess Medical Center, first as a guest lecturer and later as a technician in its adolescent care unit. Shortly thereafter, he informed the Monsignor he was working as a counselor in an alcohol/drug rehabilitation center but did not tell him he was working with adolescents. Soon after his employment, he became aware that allegations of his sexual misconduct had appeared in a Louisiana newspaper. He took

an overdose of pills which required hospitalization. Those expenses were paid by the Diocese.

Father Fontenot remained employed in the adolescent care unit until September when he began working with CompCare in its adult unit as an alcohol/drug counselor. He remained there until January 28, 1986, when he was terminated because of complaints of sexual abuse by former patients of Deaconess and CompCare. By that time, the Diocese discontinued payment of its subsidy/salary.

Criminal charges were brought against him. Monsignor Larroque was in Spokane at the time Father Fontenot was arraigned and the Diocese paid a portion of his criminal defense costs. The Monsignor helped him contact a religious community in California, where he resided until his arraignment and sentence. Subsequently, plaintiffs commenced this action.

When jurisdiction is challenged, the party asserting it has the burden of establishing its existence. *Bershaw v. Sarbacher,* 40 Wn. App. 653, 655, 700 P.2d 347 (1985). Although here the issue of jurisdiction was raised by a motion to dismiss, the court considered matters outside the pleadings, and thus the motion will be treated as one for summary judgment as to jurisdiction. *Access Rd. Builders v. Christenson Elec. Contracting Eng'g Co.,* 19 Wn. App. 477, 481, 576 P.2d 71 (1978); 2A J. Moore, *Federal Practice* § 12.09[3], at 12–82 (2d ed. 1987). Consequently, the facts and all reasonable inferences therefrom will be viewed in the light most favorable to the nonmoving party, in this case the nine plaintiffs and CompCare, for the purpose of determining the jurisdiction issue. *Access Rd. Builders v. Christenson Elec. Contracting Eng'g Co., supra.*

The plaintiffs and CompCare contend this state has personal jurisdiction over the Diocese based upon RCW 4.28-.185(1)(b):

Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the

acts in this section enumerated, thereby submits said person, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts: . . .

(b) The commission of a tortious act within this state;

■ Recently, the Supreme Court decided *Grange Ins. Ass'n v. State,* 110 Wn.2d 752, 757 P.2d 933 (1988) where it outlined the process for analyzing whether jurisdiction exists under this statute. That decision established a 2–prong process: (1) Does the statutory language purport to extend jurisdiction and (2) would imposing jurisdiction violate due process? *Grange Ins.,* at 756.

We find the statute does purport to extend jurisdiction over the conduct evidenced by the record here. Plaintiffs and CompCare argue the tortious act was the negligent supervision of Father Fontenot by the Diocese or alternatively, the Diocese should have warned Deaconess and CompCare of his pedophilia, the failure of which resulted in injury to them.[2] We agree with the trial court there is prima facie evidence to support a cause of action under both theories for purposes of satisfying the "tortious act" requirement. RCW 4.28.185(1)(b).

■ With respect to negligent supervision, an employer may be held liable for acts beyond the scope of employment because of its prior knowledge of the dangerous tendencies of its employee. *Simmons v. United States,* 805 F.2d 1363 (9th Cir. 1986); *La Lone v. Smith,* 39 Wn.2d 167, 171, 234 P.2d 893 (1951); Restatement (Second) of Agency § 213 (1958); *see also* Annot., 34 A.L.R.2d 372 (1954); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 33, at 201–03 (5th ed. 1984). With respect to the failure to warn, liability may be premised on a special relationship existing between the defendant and either the

---

[2]CompCare also asserts a third theory of liability based upon the Jesuit House's purported agency for the Diocese. However, this theory was not argued at the time of the hearing and consequently we decline to review it. *Herberg v. Swartz,* 89 Wn.2d 916, 578 P.2d 17 (1978).

third party or a foreseeable victim of the third party's conduct. *Petersen v. State,* 100 Wn.2d 421, 671 P.2d 230 (1983); Restatement (Second) of Torts § 315 (1965).

The Diocese does not address either of these theories in its brief, but argues the acts of misconduct were beyond the scope of the employment relationship because they did not arise out of Father Fontenot's priestly activities. *Rita M. v. Roman Catholic Archbishop,* 187 Cal. App. 3d 1453, 232 Cal. Rptr. 685 (1986); *Kyreacos v. Smith,* 89 Wn.2d 425, 572 P.2d 723 (1977); *Blenheim v. Dawson & Hall, Ltd.,* 35 Wn. App. 435, 667 P.2d 125, *review denied,* 100 Wn.2d 1025 (1983); *Kuehn v. White,* 24 Wn. App. 274, 600 P.2d 679 (1979). The Diocese's argument ignores the scope of the relationship which existed between the Diocese and its priest. The duty of obedience which Father Fontenot owed the Diocese encompassed all phases of his life and correspondingly the Diocese's authority over its cleric went beyond the customary employer/employee relationship. *See Code of Canon Law,* Canons 265, 273, 290, 1333, 1350, 1395 (1985). Father Fontenot informed the Diocese of the nature of his employment. Despite his employment with Deaconess, the employment relationship between Father Fontenot and the Diocese continued. There was ongoing communication between the two, and the Diocese continued to pay Father Fontenot his subsidy/salary, hospitalization costs, a portion of his criminal defense costs, and was in Spokane at the time of his arraignment.

Construing the evidence most favorably to plaintiffs and CompCare, there is prima facie evidence to satisfy the statutory requirement of a "tortious act" and further conclude the causes of action are arguably related to the Diocese's placement and maintenance of its priest in Washington. However, the issue of whether the Diocese was in fact negligent in supervising Father Fontenot or whether it should have warned Deaconess or CompCare must be resolved by the trier of fact. Consequently, we conclude the statutory language purports to extend jurisdiction.

The second prong of *Grange Ins. Ass'n v. State, supra,* requires we determine whether the exercise of jurisdiction over the Diocese would violate due process. The trial court concluded the contacts were insufficient to satisfy due process. We disagree.

■ The United States Supreme Court has articulated three criteria for making this determination: (1) purposeful "minimum contacts" must exist between the defendant and the forum state; (2) the plaintiff's injuries must "arise out of or relate to" those minimum contacts; and (3) the exercise of jurisdiction must be reasonable, that is, that jurisdiction be consistent with notions of "fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–78, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). Our State has adopted essentially the same test:

> (1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.

(Footnotes omitted.) *Tyee Constr. Co. v. Dulien Steel Prods., Inc.,* 62 Wn.2d 106, 115–16, 381 P.2d 245 (1963).

■ An objective test is used to determine jurisdiction: Should the defendant, based upon his contact with the forum state, reasonably anticipate being haled into court there? *Huebner v. Sales Promotion, Inc.,* 38 Wn. App. 66, 684 P.2d 752 (1984), *review denied,* 103 Wn.2d 1018, *cert. denied,* 474 U.S. 818 (1985). A nonresident defendant must purposefully avail itself of the privilege of conducting activities within the forum state, thereby invoking the benefits and protections of its laws. *Hanson v. Denckla,* 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958).

Stated another way, there must exist a substantial connection between the defendant and the forum state which comes about by an action of the defendant purposefully directed toward the forum state. *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026, 1033 (1987). The quality and nature of the defendant's activities determine whether the contacts are sufficient, not the number of acts or mechanical standards. *Nixon v. Cohn,* 62 Wn.2d 987, 994, 385 P.2d 305 (1963). In judging minimum contacts, the focus should be on the relationship between the defendant, the forum and the litigation. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 79 L. Ed. 2d 790, 104 S. Ct. 1473 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977)); *Hogan v. Johnson,* 39 Wn. App. 96, 102, 692 P.2d 198 (1984).

With respect to the first criterion for determining jurisdiction, the plaintiffs and CompCare assert the following purposeful contacts in this state: (1) payment of Father Fontenot's airline expenses from Louisiana to Spokane; (2) telephone conversations between the Diocese and Father Fontenot, the Jesuit House, Dr. McAllister, and the Spokane Diocese; (3) the Diocese's approval of Father Fontenot's residence in Spokane; (4) payments for Father Fontenot's room and board at the Jesuit House; (5) paying Father Fontenot a salary/subsidy; (6) providing treatment with a Spokane psychiatrist; (7) payment of psychiatric and hospital bills attendant to Father Fontenot's June 1985 drug overdose; and (8) Monsignor Larroque's presence in this state for Father Fontenot's arraignment and the subsequent payment for a portion of the attorney fees for his criminal defense. The Diocese takes the position these contacts are not sufficient to justify assumption of jurisdiction.[3] We disagree.

---

[3]The cases relied upon by it are distinguishable because either the defendant did not initiate the contact, *Lewis v. Curry College,* 89 Wn.2d 565, 573 P.2d 1312 (1978), or there was *no* contact other than the injury occurring in Washington.

As long as there is a substantial connection with the forum, even a single act can support jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. at 475 n.18; *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 2 L. Ed. 2d 223, 78 S. Ct. 199 (1957). Here, the Diocese had numerous contacts with this forum. The issue is whether the contacts were purposefully directed toward this forum and whether the defendant benefited thereby. *Grange Ins. Ass'n v. State, supra.* The Diocese ordered Father Fontenot to leave the geographical area of the Diocese because of the nature of the problem he posed to it. His residence in Spokane was not fortuitous. It was only with the Diocese's approval Father Fontenot came to reside in Spokane. By its own admission, the Diocese placed him in the Jesuit House where "he could be in an atmosphere that would either support him or, in a sense, keep him from . . . being involved with young people." The Diocese maintained Father Fontenot in Spokane *because of his pedophiliac problem.* Father Fontenot was treated for this very problem in Spokane at the Diocese's expense.

The Diocese argues that because its contacts were not affiliated with the furtherance of the ministry of the Catholic Church, its contacts were not purposeful and consequently it did not benefit thereby. This argument is specious. Here, the Diocese was engaged in purposeful conduct, disciplining and treating an errant priest. The reasons for placing Father Fontenot in Washington were twofold: (1) to avoid the harmful publicity to the Diocese and avoid worsening pending suits in Louisiana of the same nature involving others and (2) to place Father Fontenot in a supervised atmosphere until a decision could be made regarding his future. Both of these directly benefited the

---

*See Oliver v. American Motors Corp.,* 70 Wn.2d 875, 425 P.2d 647 (1967) (where Oregon residents sued an Oregon car dealer for injuries sustained in Washington); *Hogan v. Johnson, supra* (a medical malpractice claim arose from services performed in California and the plaintiff–patient moved to Washington).

Diocese. As noted in *Grange Ins. Ass'n v. State, supra* at 760 (quoting *Burger King,* 471 U.S. at 473–74):

Where defendants "'purposefully derive benefit'" from their interstate activities, it would be unfair to allow them to escape the consequences that proximately arise from these activities in other jurisdictions.

We conclude the Diocese purposefully availed itself of the privilege of conducting activities within this forum and invoked the benefits and protections of our laws.

As to the second criterion, we must determine whether the causes of action arose out of those activities. RCW 4.28.185(3). The Diocese argues the cause of action which sounds in tort does not arise out of the payment of the subsidy to Father Fontenot and the other expenses previously outlined, and therefore does not satisfy the second due process criterion. We disagree.

As previously stated, it is not the individual acts which determine whether jurisdiction is proper, but it is the nature and quality of the acts which are significant. *Nixon v. Cohn, supra* at 994. The Diocese's very reason for placing Father Fontenot in Spokane and maintaining him there for 2 years became the subject matter of the lawsuit with which it is now faced. We conclude there is sufficient evidence to satisfy the second due process element.

█ Finally, in determining whether the third criterion has been met, we consider the interest of the State in providing a forum for its citizens, the relative availability of witnesses and evidence, amenability of all defendants to service of process and expense of the plaintiffs and CompCare in bringing the action elsewhere. *Callahan v. Keystone Fireworks Mfg. Co.,* 72 Wn.2d 823, 435 P.2d 626 (1967); *Nixon v. Cohn, supra.*

The State of Washington has a legitimate concern for protection of its children from sexual molestation. RCW 26.44.030. Of import is the fact that the injuries occurred in the state of Washington. Plaintiffs and CompCare, as well as the medical and other expert witnesses, are in Washington. The defendants, other than the Lafayette Diocese, are

subject to jurisdiction in Washington, but not in Louisiana. Thus, there would be an additional burden on the plaintiffs and CompCare in bringing two lawsuits if jurisdiction is not assumed in Washington. Additionally, plaintiffs and Comp-Care would be put to substantial expense in litigating their cause of action in Louisiana rather than Washington. Consequently, assumption of jurisdiction by this State does not offend traditional notions of fair play and substantial justice. Thus, the third due process criterion is met.

We conclude the court erred in granting the Diocese's motion to dismiss for lack of jurisdiction. Given this conclusion, it is unnecessary to address the remaining issues raised by plaintiffs and CompCare.

Reversed and remanded.

THOMPSON, C.J., and McINTURFF, J. Pro Tem., concur.

Review denied by Supreme Court February 28, 1989.