1999-NMCA-052

980 P.2d 77

**Navor TERCERO, Plaintiff–Appellant,**

v.

**ROMAN CATHOLIC DIOCESE OF NORWICH, CONNECTICUT, Defendant–Appellee.**

**No. 18,717.**

Court of Appeals of New Mexico.

Feb. 9, 1999.

Certiorari Granted, No. 25,618, April 7, 1999.

Cynthia A. Fry, Daymon B. Ely, Albuquerque, for Appellant.

Lisa P. Ford, Beall & Biehler, P.A., Albuquerque, for Appellee.

## O P I N I O N

ARMIJO, Judge.

{1} The formal opinion filed on December 28, 1998, is hereby withdrawn and the following opinion is substituted. The motion for rehearing filed by Defendant is denied.

{2} Plaintiff appeals from a district court order dismissing his claims against the Roman Catholic Diocese of Norwich, Connecticut (the Diocese), for lack of personal jurisdiction. Plaintiff alleges that the Diocese is liable for the alleged sexual abuse committed against him by Father Bernard Bissonnette, a priest ordained and incardinated in the Diocese. Plaintiff contends on appeal that New Mexico has personal jurisdiction over the Diocese because: (1) the Diocese transacted business within the state; and (2) the Diocese committed a tortious act which caused Plaintiff's injuries within the state. Without addressing the merits of the allegations, we determine for jurisdictional purposes that the Diocese transacted business within the state. We further determine that the Diocese committed a tortious act sufficient to satisfy this state's exercise of personal jurisdiction over it. We therefore reverse the order below.

## I. FACTUAL BACKGROUND

{3} The Diocese incardinated Father Bissonnette in 1958. In June 1962, it transferred him to another parish within the Diocese because parishioners reported conduct on his part involving "familiarities" with boys. In April 1963, parents of two boys in the new parish reported that Father Bissonnette had sexually molested their children. Upon receipt of these reports, the Diocese again transferred him; this time, however, it sent him to a monastery, formerly known as Via Coeli, in Jemez Springs, New Mexico (Via Coeli). The Diocese ordered this transfer in the hope that Father Bissonnette would receive counseling and therapy for pedophilia. Concurrent with the transfer, the Bishop of Norwich (the Bishop) suspended Father Bissonnette "a divinis," meaning he was forbidden to exercise the powers of a priest for the duration of the suspension.

{4} The Servants of the Paraclete (the Servants) operated Via Coeli and the Archbishop of Santa Fe was allegedly their direct superior prior to 1971. Nonetheless, during his tenure at Via Coeli, the Servants regularly reported to the Bishop concerning Father Bissonnette's activities and sought guidance regarding the administration of his punishment. For example, Father Fitzgerald, a priest at Via Coeli, specifically asked the Bishop to inform Father Bissonnette directly regarding the duration of his suspension.

{5} In a May 3, 1963, letter to Father Fitzgerald, however, the Bishop wrote, "I delegate you with the power of subdelegating

to remove the censure within the external forum when you feel it advisable"; notably, there is no evidence in the record that the Diocese ever revoked this delegation. While Father Fitzgerald exercised these newly delegated powers, he continued to rely upon the Bishop's advice as to Father Bissonnette's "future status."

{6}   For example, in response to a December 1963 inquiry as to Father Bissonnette's future, the Bishop informed Father Fitzgerald that he could not accept Father Bissonnette back into the Diocese, due in large part to his notoriety. As the Bishop noted to Father Fitzgerald, "[s]ince our diocese is so compact, it would be impossible for me to give him an assignment here where his past faults would be unknown." He then noted to Father Fitzgerald three possible alternatives. First, Father Bissonnette ought to search for "a benevolent bishop" in another diocese for whom he could work. However, if he could not find such employment, he "would have only two alternatives: to stay indefinitely at Via Coeli, if [they] can keep him, or to request the Holy See to reduce him to the lay state." Billing records indicate that the Diocese continued to pay for Father Bissonnette's stay at Via Coeli in 1964.

{7}   In August 1964, Father Bissonnette wrote to the Bishop requesting permission for a three-week vacation and to "inquire as to [the Bishop's] future plans" for him. Communicating through his Vicar General, the Bishop approved the request for a short family visit. However, the Vicar General informed Father Bissonnette that while the Bishop "would have no objection to your return to New England or New York . . . you are not to return to the State of Connecticut." The letter further stated "You will agree with me for, I am sure, you are aware of the fact that your faults are known by the priests of the diocese and by some members of the laity. As a result there is no pastor here who would be willing to accept you as his Assistant." As to future plans, the Bishop recommended to Father Bissonnette that "through your Superior, Father Fitzgerald, you seek a Benevolent Bishop for whom you could work a year or two. . . . After that,

your procedure would be to seek incardination in that diocese." Billing records and correspondence indicate that Father Bissonnette took his vacation, returned to Via Coeli, and was then transferred by one of the priests there to a facility operated by the Servants in Nevis, Minnesota.

{8}   In March 1966, after failing to obtain an appointment in a diocese outside of New Mexico, Father Bissonnette wrote to the Bishop requesting permission to return to "the Paraclete House in Albuquerque, New Mexico[.]" He stated, "I have no alternative." The Bishop granted permission for his return to this state, "provided the Superiors there are willing to accept you."

{9}   Upon his return, the Servants arranged for him to meet with the Archbishop of Santa Fe, who shortly thereafter assigned him to work in St. Anne's Parish in Santa Fe. On March 22, 1966, Father Bissonnette informed the Bishop of his new assignment, and in a second letter, he sought the Bishop's approval of his plan to apply for incardination in the Archdiocese of Santa Fe "by this time next year." The Bishop responded that "he would grant permission if [Father Bissonnette] were to be incardinated into the [Archd]iocese." However, the Archdiocese of Santa Fe never incardinated him. In the Official Catholic Directory for the years 1963–68, he continued to be listed under the Diocese of Norwich.

{10}   In May 1968, priests at Via Coeli wrote to the Bishop and informed him that Father Bissonnette had returned to the monastery because of further "complaints, the nature of which you are all too familiar with." The Bishop responded with a letter agreeing to pay for Father Bissonnette's further treatment. The record indicates that throughout this period the Diocese's medical insurance covered Father Bissonnette.

{11}   Plaintiff alleges that he was sexually abused by Father Bissonnette in New Mexico between 1966 and 1968.

## II. STANDARD OF REVIEW

{12}   When a timely challenge is raised under Rule 1–012(B)(2) contesting the existence of personal jurisdiction, the party

asserting jurisdiction has the burden of establishing such fact. When ruling upon a motion to dismiss under Rule 1–012(B)(2), the trial court has discretion to permit discovery to help decide the issue or resolve the issue either upon written affidavits or through a pretrial evidentiary hearing. *See Doe v. Roman Catholic Diocese of Boise, Inc.,* 1996–NMCA–057, 121 N.M. 738, 742, 918 P.2d 17, 21. In the present case, the district court decided the motion to dismiss upon written affidavits, discovery which included deposition testimony and answers to interrogatories, briefs, correspondence, and oral argument. The district court entered its order of dismissal without making any findings of fact or conclusions of law. Once the question of jurisdiction is properly raised, the burden of supporting the jurisdictional allegations is shifted to the party asserting jurisdiction, although, if there is no evidentiary hearing, the burden on a plaintiff "is somewhat lessened in that the trial court will consider the affidavits in the light most favorable to the plaintiff." *Id.* Plaintiff met his burden because the complaint and affidavit and other documentation demonstrate a prima facie showing that jurisdiction exists.

### III. LONG–ARM STATUTE

■ {13} Under New Mexico's long-arm statute, this state may exercise personal jurisdiction over nonresidents. *See* NMSA 1978, § 38–1–16 (1959). Section 38–1–16 provides in pertinent part:

A. Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts enumerated in this subsection thereby submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from:

(1) the transaction of any business within this state;

. . . .

(3) the commission of a tortious act within this state;

. . . .

C. Only causes of action arising from acts enumerated in this section may be asserted against a defendant in an action in which jurisdiction is based upon this section.

This statute extends the jurisdictional reach of New Mexico courts as far as constitutionally permissible. *See United Nuclear Corp. v.. General Atomic Co.,* 91 N.M. 41, 42, 570 P.2d 305, 306 (1977).

{14} We analyze this jurisdictional challenge solely upon the facts unique to this case. *See Diocese of Boise,* 121 N.M. at 743, 918 P.2d at 22. To these facts, we apply three criteria: (1) Did the Diocese commit an act or omission specifically set forth in the statute?; (2) Does Plaintiff's cause of action arise from and concern the alleged act or omission?; and (3) Has the Diocese established sufficient minimum contacts with New Mexico to satisfy constitutional due process concerns? *See Federal Deposit Ins. Corp. v. Hiatt,* 117 N.M. 461, 463, 872 P.2d 879, 881 (1994); *Sanchez v. Church of Scientology,* 115 N.M. 660, 663, 857 P.2d 771, 774 (1993); *Diocese of Boise,* 121 N.M. at 742, 918 P.2d at 21. We note that the analysis of whether a defendant transacted business or committed a tortious act within the state merges with the inquiry into whether such activities constitute sufficient minimum contacts to satisfy due process. *See, e.g., Telephonic, Inc. v. Rosenblum,* 88 N.M. 532, 534, 543 P.2d 825, 827 (1975); *Visarraga v. Gates Rubber Co.,* 104 N.M. 143, 146, 717 P.2d 596, 599 (Ct.App.1986); *Tarango v. Pastrana,* 94 N.M. 727, 728, 616 P.2d 440, 441 (Ct.App. 1980).

■ {15} Applying these rules to the facts before us, we determine that the Diocese has transacted business within this state sufficient to satisfy both statutory and constitutional requirements. Furthermore, for purposes of personal jurisdiction, we determine that the Diocese committed a tortious act in New Mexico through its agent, Father Fitzgerald of Via Coeli. Finally, we determine that Plaintiff's claims arise from the Diocese's activities within New Mexico. Accordingly, we conclude that New Mexico's courts are vested with personal jurisdiction over the Diocese in this matter.

**A.** *The Diocese Transacted Business Within New Mexico*

{16} "[T]ransaction of any business" under Section 38–1–16(A)(1) has been defined as "'doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, or otherwise accomplishing an object, or doing a single act for such purpose with the intention of thereby initiating a series of such acts.'" *Telephonic, Inc.,* 88 N.M. at 534, 543 P.2d at 827 (quoting Restatement (Second) of Conflict of Laws § 35 cmt. a, at 142 (1971)). The fact that the Diocese is a non-profit, religious organization does not exempt it from "transacting business" within the meaning of New Mexico's long-arm statute. *See Benally ex rel. Benally v. Amon Carter Museum,* 858 F.2d 618, 622–23 (10th Cir.1988). "When a wrong results from purposeful, organized activity, in terms of a state's interest in redressing harm to its citizens, it makes little difference whether that activity was of a commercial character or not." *Id.* at 623. The Diocese's acts in the present case satisfy this statutory requirement.

{17} The actions of the Diocese consisted of the following: (1) intentionally sending Father Bissonnette to Via Coeli, paying for his room, board, and other expenses associated with his stay at Via Coeli; (2) authorizing his privileges and punishment while he was in New Mexico; (3) monitoring his progress at Via Coeli; (4) making Father Fitzgerald the Diocese's agent for purposes of monitoring his period of suspension and lifting the disciplinary suspension at his discretion; and (5) using the Servants as intermediaries in obtaining work for him outside of Connecticut.

{18} Under similar scenarios, courts in other jurisdictions have held that they were vested with personal jurisdiction over the foreign diocese in which the alleged pedophilic priest was incardinated. *See, e.g., Does 1–22 v. Roman Catholic Bishop of Fall River,* 509 N.W.2d 598 (Minn.Ct.App.1993); *Does 1–9 v. CompCare, Inc.,* 52 Wash.App. 688, 763 P.2d 1237 (1988). In the present case, viewed as a whole, the Diocese's acts demonstrate a course of conduct sufficient to satisfy the requirements of Section 38–1–16(A)(1). *See Bishop of Fall River,* 509 N.W.2d at 601;

*CompCare,* 763 P.2d at 1243. Moreover, the quality of these contacts are such that New Mexico's exercise of personal jurisdiction over the Diocese would be consistent with constitutional considerations of due process. In making this determination, we examine whether the Diocese "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Diocese of Boise,* 121 N.M. at 743, 918 P.2d at 22. We further examine whether, based upon the foregoing activities directed at the forum state, the Diocese could have "reasonably anticipate[d] being haled into [our] court[s]." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

{19} The Diocese's actions demonstrate a purposeful availment of New Mexico which served to place Father Bissonnette "in a supervised atmosphere [outside the Diocese] until a decision could be made regarding his future." *CompCare,* 763 P.2d at 1243. The placement further served to discipline an errant priest, and "to avoid the harmful publicity to the Diocese" and to protect Connecticut parishioners from further abuse. *Id.* Significantly, the Diocese of Norwich expressly designated Father Fitzgerald of Via Coeli to act as its agent in New Mexico for the purpose of removing Father Bissonnette's censure.

{20} In support of its argument that its contacts with New Mexico are insufficient to justify its being subject to suit within this jurisdiction, the Diocese relies upon *Diocese of Boise,* 121 N.M. at 743–44, 918 P.2d at 22–23. In that case, we determined that New Mexico lacked personal jurisdiction over a foreign diocese when the plaintiff failed to show that the diocese played any role in a pedophilic priest's decision to come to New Mexico. *See id.* at 744, 918 P.2d at 23. We do not agree with the Diocese that the facts in *Diocese of Boise* control the instant case.

{21} *Diocese of Boise* is distinguishable from the present case in at least two important respects. First, unlike that case, the Diocese initiated contact with the Servants because of Father Bissonnette's known acts

of sexual abuse in the State of Connecticut; indeed, the very reason for his placement in New Mexico was this pedophilia. *Cf. Bishop of Fall River,* 509 N.W.2d at 601; *CompCare,* 763 P.2d at 1243–44. Second, the Diocese, in the present case, sent him to New Mexico of its own initiative and played a significant role in his decision to return and find work. Moreover, as previously noted, the Diocese expressly designated Father Fitzgerald as its agent in New Mexico, vesting him with the authority to "remove the censure within the external forum when you feel it advisable." These factual premises are far removed from those present in *Diocese of Boise,* 121 N.M. at 744, 918 P.2d at 23.

{22} We conclude that, given its intentional placement of Father Bissonnette in this state, the subsequent supervision and control which it exercised over him, and its delegation of authority to Father Fitzgerald, the Diocese could have reasonably foreseen being subject to New Mexico jurisdiction. *See World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559; *see also Benally,* 858 F.2d at 624. Due process, therefore, would not be offended by this state's exercise of personal jurisdiction over the Diocese.

**B.** *The Diocese has Committed a Tortious Act Within New Mexico Sufficient for Jurisdictional Purposes*

{23} While we have already found sufficient grounds for New Mexico's exercise of personal jurisdiction over the Diocese based upon its transaction of business within the state, we note that the district court also dismissed Plaintiff's suit for failing to show that the Diocese had committed a tortious act in this state. Accordingly, we address this second question so as not to affirm by our silence the district court's finding on this matter.

{24} "The question of personal jurisdiction over out-of-state residents involves more than ... the technical 'commission of a tortious act' within New Mexico. The meaning of [that] term[ ], in our statute, is to be equated with the minimum contacts sufficient to satisfy due process." *Tarango,* 94 N.M. at 728, 616 P.2d at 441. Plaintiff argues that the Diocese's negligent supervision of Father

Bissonnette constituted a tort causing injury in New Mexico. For purposes of the narrow jurisdictional question before us, we agree.

{25} We note that other courts have imputed, for purposes of personal jurisdiction, the tortious conduct of a pedophilic priest to his incardinating diocese on a theory of respondeat superior. *See Bishop of Fall River,* 509 N.W.2d at 600–601 (noting "ongoing relationship" between the priest and his diocese, including the diocese's "ultimate authority over [the priest's] status as a priest"); *CompCare,* 763 P.2d at 1242 (noting "employment relationship" as well as "ongoing communication between" the priest and his diocese and the diocese's continued financial support for the priest).

{26} However, of special importance to this Court is the unrevoked principal-agent relationship between the Diocese and Father Fitzgerald. At all times pertinent to this suit, Father Fitzgerald was the Diocese's agent in New Mexico, acting at its behest and in its interests regarding the supervision and censure of Father Bissonnette. *See Hansler v. Bass,* 106 N.M. 382, 387, 743 P.2d 1031, 1036 (Ct.App.1987); *see also Ulibarri Landscaping Material, Inc. v. Colony Materials, Inc.,* 97 N.M. 266, 269, 639 P.2d 75, 78 (Ct.App.1981) ("If an act done by one person on behalf of another is, in its essential nature, one of agency, the one is an agent of the other notwithstanding that he is not so called."). Therefore, to the extent that Father Fitzgerald acted negligently in his supervision of Father Bissonnette, a known pedophile, his negligence is rightly imputed to the Diocese. *See Bailey v. Jeffries–Eaves, Inc.,* 76 N.M. 278, 288, 414 P.2d 503, 510 (1966); *see also Hansler,* 106 N.M. at 386, 743 P.2d at 1035 (noting that a principal will be liable for the acts of its agent "when the [principal-agent] relationship existed in respect to the very thing from which the injury arose").

{27} While leaving to the trier of fact the ultimate determination of whether this principal-agent relationship also imputes liability to the Diocese, we hold that Plaintiff has made a prima facie showing on this point. *See CompCare,* 763 P.2d at 1242. New Mexi-

co accordingly has personal jurisdiction over the Diocese regarding its alleged commission of a tortious act within this state.

### C. *Plaintiff's Claims Arise from and Concern the Diocese's Activities Within New Mexico*

{28} We must next determine whether "a close relationship ... exist[s] between the act committed by the defendant and the plaintiff's claim." *State Farm Mut. Ins. Co. v. Conyers,* 109 N.M. 243, 245, 784 P.2d 986, 988 (1989); *see also* § 38-1-16(C). The Diocese contends that there is no relationship between its contacts with New Mexico and Plaintiff's allegations of sexual abuse because Father Bissonnette, unilaterally and of his own initiative, made the decision to return to New Mexico after his initial stay at Via Coeli. We disagree.

{29} The record discloses that Father Bissonnette could not return to New Mexico without the Diocese's permission. The Diocese specifically instructed him that, if he was to remain a member of the priesthood, he must stay with the Servants or find work under a bishop in another diocese. The Diocese further instructed him that he should seek work through his superiors at Via Coeli. It was only in accordance with these instructions, and after his efforts to find work elsewhere were unsuccessful, that Father Bissonnette requested the Bishop's permission to return to the Servants in New Mexico. The Bishop granted permission.

{30} This evidence demonstrates the significant control the Diocese continued to exert over Father Bissonnette. *Cf. CompCare,* 763 P.2d at 1242 (noting special relationship between priest and diocese); *cf. also Bishop of Fall River,* 509 N.W.2d at 600 (noting diocese's "ultimate authority" over priest). It further shows that Father Bissonnette's return to New Mexico, at which time the acts alleged in Plaintiff's suit occurred, was not mere happenstance: he returned to New Mexico as a result of the Diocese's intentional acts. The Diocese created, cultivated, and fostered the relationship between Father Bissonnette and New Mexico. As Father Bissonnette acknowledged, he had "no alternative" but to return to New Mexico due, in part, to the relationship that the Diocese had created. The proximate result of this relationship was Father Bissonnette's ultimate placement with the Parish of St. Anne, where the alleged sexual abuse occurred.

{31} The Diocese argues, however, that it is shielded from New Mexico's long-arm jurisdiction because the Servants, and not the Diocese, made the decision to place Father Bissonnette with the Parish of St. Anne. We do not agree. We need not delve into the domain of canon law to determine that there was an ongoing relationship between the Diocese and Father Bissonnette in which the Servants functioned only as an intermediary. Moreover, insofar as the Archbishop of Santa Fe was the direct superior of the Servants, it was reasonably foreseeable that the Servants, acting at the Diocese's behest, would attempt to find work for Father Bissonnette within the Archdiocese of Santa Fe.

{32} For these reasons, we conclude that the record suggests: (1) the Diocese possessed considerable authority over Father Bissonnette at all times pertinent to this suit; (2) the scope of this authority extended to Father Bissonnette's choice of work and his duty to abstain from sexual activity; (3) his presence in New Mexico was the result of the Diocese's exercise of this authority; and (4) for purposes of personal jurisdiction only, the Servants functioned as the Diocese's intermediary. We therefore determine that Plaintiff's claims lie sufficiently in the wake of the Diocese's activities in this state to support New Mexico's exercise of personal jurisdiction over it. *See Benally,* 858 F.2d at 623-24.

{33} Finally, we conclude by noting that in this determination "we consider the interest of the state in providing a forum for its citizens, the relative availability of witnesses and evidence, amenability of all defendants to service of process and expense to the plaintiffs ... in bringing the action elsewhere." *CompCare,* 763 P.2d at 1244. In this case, the alleged abuse of Plaintiff occurred in New Mexico, and this State "has a legitimate concern for protection of its children from sexual molestation." *Id.* The district court's exercise of personal jurisdiction over the Diocese, therefore, will comport with the stan-

dards of fair play and substantial justice. *See Benally*, 858 F.2d at 626.

## IV. CONCLUSION

{34} We accordingly reverse the district court's dismissal of Plaintiff's claims against the Diocese of Norwich for lack of personal jurisdiction and remand this case for further proceedings consistent with this opinion.

. {35} IT IS SO ORDERED.

DONNELLY and BOSSON, JJ., concur.