[No. 29771. Department One. March 22, 1946.]

JAMES MAPES, *Respondent,* v. MABEL MAPES, *Appellant.*[1]

[1]Reported in 167 P. (2d) 405.

C. A. *Schneider*, for appellant.

*Welts & Welts*, for respondent.

SIMPSON, J.—This action was instituted by plaintiff for the purpose of securing a divorce from defendant. In the complaint it was alleged that defendant became infatuated with another man and, on or about September 18, 1944, left the state of Washington with him; that by note defendant informed plaintiff she was going to live her own life and would never return to plaintiff or their family. Plaintiff also asked for the care, custody, and control of the two minor children of himself and defendant, together with the property belonging to the parties to the action.

Defendant could not be located in the state of Washington, and summons was accordingly published. Before trial, however, defendant served and filed an answer and cross-complaint. The answer contained a general denial of the charges made against her by the plaintiff. By way of affirmative answer, defendant alleged that plaintiff had treated her in a cruel manner, in that he quarreled, nagged, and found fault with her, and at times was morose and sullen, had fits of temper, and threatened to kill himself. She further alleged that on September 18, 1944, she left plaintiff and established a home in another state.

By way of cross-complaint, the defendant alleged that, after she left the state of Washington, she established her residence and domicile in the state of Nevada and, in accordance with the laws of that state, commenced an action for divorce against plaintiff and on the 21st day of December, 1944, was granted a divorce from plaintiff. The defendant alleged further that the court in Nevada did not

divide the property belonging to herself and plaintiff, and that it was presently owned by them in common. The reply put in issue the allegations made by defendant.

After trial, the court made its findings of fact and conclusions of law and, based thereon, entered its interlocutory order granting a divorce to plaintiff. Defendant thereupon appealed to this court. She contends that the court erred in the following particulars: (a) holding the Nevada divorce invalid; (b) holding a certain note an obligation of the community; (c) the admission of testimony; (d) the refusal to grant sufficient attorneys' fees; (e) distributing the property; (f) refusing to hear application for change of custody of one child; and (g) entering findings of fact and conclusions of law and judgment.

The salient facts may be stated as follows: Appellant and respondent were married May 7, 1926. Two children, Gerald and Donald, were born to them. At the time of trial, Gerald was nineteen years old, and Donald was sixteen years of age. Gerald was in the navy, and Donald was attending high school. Appellant and respondent were childhood sweethearts and, after their marriage, lived an especially happy life together until sometime during the year 1944. During their married life, the parties accumulated property consisting of a farm, some cows, certain farming equipment, household goods, and an automobile, all of a total value of $25,250.50. Their liabilities total $11,000. Of the liabilities, $5,000 was in the form of a note due and owing to respondent's father.

The following facts justified the trial court in finding that appellant was to blame for the separation: During the early part of the summer of 1944, appellant became acquainted with a man named Ernie Ruff. Shortly thereafter, appellant and Ruff were seen together in his car on many occasions and, on many other occasions, were found kissing and making love to each other. September 18, 1944, appellant journeyed to Seattle, from which place she called Ruff, and the two started for Nevada in his car. The first two nights, they stayed in an auto court somewhere between Seattle and Tacoma. After that, they stayed in auto courts

in Pendleton, Oregon; Boise, Idaho; and Ogden, Utah; and finally arrived at Las Vegas, Nevada.

Appellant stated that she went to Nevada "to get work and then get a divorce." She arrived in Las Vegas, September 22, 1944, and, November 8th of that year, started her action for divorce. December 21, 1944, the Nevada court granted her a decree of divorce, and on the same day she married Ruff. They then departed for Los Angeles, California. During the time appellant was in Las Vegas, she contrived to have her mail sent from Los Angeles.

Was the Nevada divorce valid?

The judgment in that case read as follows:

"In the Eighth Judicial District Court of the State of Nevada in and for the County of Clark.

"Mabel Mapes, No. 22422
 Plaintiff, Endorsed
 -vs- Filed Dec. 21, 1944
"James Mapes, Lloyd S. Payne, Clerk
 Defendant. By Vivian Phillips, Deputy

"Decree of Divorce

"This cause came on regularly for trial on the 21st day of December, 1944, before the above entitled Court, sitting without a jury, the Plaintiff appearing in person and being represented by Wiley and Ralli, her attorneys, and the Defendant having failed to answer, demur, or otherwise plead herein, although duly and regularly served with a certified copy of the Complaint attached to a copy of the Summons issued herein, on the 20th day of November, 1944, at Skagit County, State of Washington, and more than thirty days, exclusive of day of service having expired since said service upon the Defendant, and no further time having been granted, his default *default* was regularly and duly entered on the 21st day of December, 1944, for failing to answer or make defense to Plaintiff's Complaint herein; after hearing the evidence adduced in support of Plaintiff's Complaint, considering all and singular the law and the premises, the Court finds it has jurisdiction over the parties hereto and over the subject matter hereof and that each and every of the allegations contained in Plaintiffs Complaint are true, and that Plaintiff is entitled to a Decree of Divorce from the Defendant on the ground as set forth in the Complaint on file herein.

"Now, THEREFORE, it is hereby ORDERED, ADJUDGED AND DECREED that the marriage relationship now and heretofore existing between the Plaintiff and Defendant be, and the same is, hereby dissolved, and the parties are restored to their former status as single persons.

"DATED AND DONE at Las Vegas, Clark County, Nevada, this 21st day of December, 1944. GEORGE E. MARSHALL
"District Judge"

It is appellant's contention that the divorce decree given her by the Nevada court dissolved the bonds of matrimony existing between herself and plaintiff, this upon the ground that the courts of this state must recognize as valid the judgments of a sister state under the full faith and credit provision of the Federal constitution.

Respondent contends that the Nevada divorce was invalid, for the reason that the court in that state did not have jurisdiction to hear the case, in that appellant was not a resident of Nevada at the time she instituted her action.

 Proof of residence is essential, and a divorce obtained with the aid of an assumed residence is not in good faith and does not give the court jurisdiction of the case. Domicile or residence is mainly a question of intent, which may be shown by the testimony of the parties and by surrounding circumstances. *Wilkes v. Wilkes,* 245 Ala. 54, 16 So. (2d) 15; *Gilmore v. Gilmore,* 204 Ark. 643, 164 S. W. (2d) 446; *Phillips v. Phillips,* 146 Fla. 311, 1 So. (2d) 186; *Gates v. Gates,* 197 Ga. 11, 28 S. E. (2d) 108; *Wright v. Wright,* 350 Mo. 325, 165 S. W. (2d) 870. Restatement of the Law, Conflict of Laws, p. 168, § 111.

The principal question is as to whether or not the courts of this state may inquire into the facts relative to the residence or domicile of appellant, at the time she sought her divorce in the state of Nevada. The constitution of the United States, Art. IV, § 1, provides that full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state.

"Where a judgment rendered in one state is challenged in another, a want of jurisdiction over either the person or

the subject matter is of course open to inquiry." *Milliken v. Meyer*, 311 U. S. 457, 85 L. Ed. 278.

*Holman v. Tjosevig*, 136 Wash. 261, 239 Pac. 545.

■■ The provisions of the Federal constitution, which require that full faith and credit shall be given in each state to the judicial proceedings of every other state, do not prevent a collateral attack upon the jurisdiction of the court of a sister state to render the judgment offered in evidence in an action brought in another state. It is settled law that, to give courts of a state jurisdiction over a marriage relation between husband and wife, one of the parties at least must have a domicile within the state. This court, in speaking of the full faith and credit provisions of the Federal constitution, stated in *Dormitzer v. German Savings & Loan Society*, 23 Wash. 132, 62 Pac. 862, as follows:

"The decision of the supreme court of the United States upon questions arising under this provision of the constitution and laws of congress, to give it effect, should be controlling upon the supreme court of this state. The supreme court of the United States, in *Thompson v. Whitman*, 18 Wall. 457, has decided against the contention of the respondent. In that case the court says:

" 'The main question in the cause is, whether the record produced by the defendant was conclusive of the jurisdictional facts therein contained. It stated, with due particularity, sufficient facts to give the justices jurisdiction under the law of New Jersey. Could that statement be questioned collaterally in another action brought in another state? If it could be, the ruling of the court was substantially correct. If not, there was error.'

"The judgment was affirmed. The syllabus is as follows; and is fully borne out by the text:

" 'Neither the constitutional provision, that full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state, nor the act of congress passed in pursuance thereof, prevents an inquiry into the jurisdiction of the court by which a judgment offered in evidence was rendered.

" 'The record of a judgment rendered in another state may be contradicted as to the facts necessary to give the court jurisdiction; and if it be shown that such facts did not exist the record will be a nullity, notwithstanding it may recite that they did exist.

" 'Want of jurisdiction may be shown either as to the subject-matter or the person, or, in proceedings *in rem,* as to the thing.

" 'By a law of New Jersey non-residents were prohibited from raking clams and oysters in the waters of that state under penalty of forefeiture of the vessel employed; and any two justices of the county in which the seizure of the vessel should be made were authorized, on information given, to hear and determine the case: *Held,* that if the seizure was not made in the county where the prosecution took place, the justices of that county had no jurisdiction, and that this fact might be inquired into in an action for making such seizure brought in New York, notwithstanding the record of a conviction was produced which stated that the seizure was made within such county.'

"We think, from the extrinsic evidence in this case, and that intrinsically appearing in the record offered in evidence, that the Kansas court had no jurisdiction to enter the decree of divorce pleaded, that such decree is fraudulent and void, and no bar to the property rights of the wife, and that the marriage ceremony at Spokane was an empty form."

In that case, this court held that a certain divorce decree entered by a Kansas court was invalid, because of the fact that the plaintiff was not domiciled in that state at the time he instituted his action of divorce. The laws of Kansas, at the time the divorce action was filed, provided that a plaintiff in a divorce action, in order to institute his action, must have been an actual resident of the state for one year next preceding the filing of the complaint, and be a resident of the county in which the action was brought at the time the complaint was filed. The facts in the above case showed that the plaintiff had, prior to the filing of the complaint, decided to make his permanent home in the city of Spokane, Washington, and had taken certain definite steps to carry out that intent by purchasing land in Spokane and erecting a building thereon. In passing upon the question relative to the Kansas decree, this court made the statement above set out.

In an action known as the *Williams* case, involving a divorce action, the supreme court of the United States reached the same conclusion arrived at by this court in the

*Dormitzer* case. The facts in the *Williams* case, as gleaned from the court records, are these: One O. B. Williams was a married man living in the state of North Carolina. Lilly Hendrix was a married woman living in the same state. Williams and Mrs. Hendrix traveled to Las Vegas, Nevada, at which place, after a stay of six weeks, they started actions for divorce against their respective spouses. The defendants in those actions entered no appearance, nor were they served with process in Nevada. In the *Hendrix* case, service was had by publication of summons. In the *Williams* case, a sheriff served Mrs. Williams in North Carolina with a copy of the summons and complaint. Decree of divorce was entered in the *Hendrix* case, October 4, 1940, and in the *Williams* case, August 26, 1940. In each case, the Nevada court made a finding of bona fide residence for the six weeks required by the Nevada statute, § 9460, Nev. Comp. L. 1929, as amended L. 1931, p. 161. The parties were then married to each other October 4, 1940, and returned to North Carolina where they lived together as man and wife. Thereafter, they were convicted of bigamous cohabitation. The conviction was upheld by the North Carolina supreme court. *State v. Williams,* 220 N. C. 445, 17 S. E. (2d) 769.

An appeal to the United States supreme court, *Williams v. North Carolina,* 317 U. S. 287, 87 L. Ed. 279, 63 S. Ct. 207, 143 A. L. R. 1273, resulted in a reversal of the state supreme court decision. The ground of reversal was that a charge to the jury that substituted service amounted to no appearance and would not be recognized in North Carolina was improper; further that the decision of the supreme court of North Carolina that that state was not required to recognize a divorce decree by reason of the holding of *Haddock v. Haddock,* 201 U. S. 562, 50 L. Ed. 867, 26 S. Ct. 525, could not be sustained. The court in deciding the *Williams* case overruled *Haddock v. Haddock.* The cause was then sent back to the North Carolina courts for a new trial.

The new trial resulted in another conviction of the defendants Williams and Hendrix. At the second trial the state contended that the Nevada court did not have jurisdiction to hear and determine the divorce actions. The con-

viction was upheld by the supreme court of North Carolina. *State v. Williams,* 224 N. C. 183, 29 S. E. (2d) 744.

The supreme court of the United States granted certiorari and, in a well-considered opinion, affirmed the decision of the supreme court of North Carolina. In speaking of the full faith and credit clause of the constitution, the court said (*Williams v. North Carolina,* 325 U. S. 226, 89 L. Ed. 1123, 65 S. Ct. 1092):

"But the Clause does not make a sister-State judgment a judgment in another State. The proposal to do so was rejected by the Philadelphia Convention. 2 Farrand, The Records of the Federal Convention of 1787, 447-48. 'To give it the force of a judgment in another state, it must be made a judgment there.' *M'Elmoyle v. Cohen,* 13 Pet. 312, 325. It can be made a judgment there only if the court purporting to render the original judgment had power to render such a judgment. A judgment in one State is conclusive upon the merits in every other State, but only if the court of the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment."

Again, it stated:

"Under our system of law, judicial power to grant a divorce—jurisdiction, strictly speaking—is founded on domicil. . . .

"But those not parties to a litigation ought not to be foreclosed by the interested actions of others; especially not a State which is concerned with the vindication of its own social policy and has no means, certainly no effective means, to protect that interest against the selfish action of those outside its borders. The State of domiciliary origin should not be bound by an unfounded, even if not collusive, recital in the record of a court of another State. As to the truth or existence of a fact, like that of domicil, upon which depends the power to exert judicial authority, a State not a party to the exertion of such judicial authority in another State but seriously affected by it has a right, when asserting its own unquestioned authority, to ascertain the truth or existence of that crucial fact. . . .

"If a finding by the court of one State that domicil in another State has been abandoned were conclusive upon the old domiciliary State, the policy of each State in matters of most intimate concern could be subverted by the policy of every other State. This Court has long ago denied the

existence of such destructive power. The issue has a far reach. . . .

"In short, the decree of divorce is a conclusive adjudication of everything except the jurisdictional facts upon which it is founded, and domicil is a jurisdictional fact. To permit the necessary finding of domicil by one State to foreclose all States in the protection of their social institutions would be intolerable.

"But to endow each State with controlling authority to nullify the power of a sister State to grant a divorce based upon a finding that one spouse had acquired a new domicil within the divorcing State would, in the proper functioning of our federal system, be equally indefensible. . . .

"The scales of justice must not be unfairly weighted by a State when full faith and credit is claimed for a sister-State judgment. But North Carolina has not so dealt with the Nevada decrees. She has not raised unfair barriers to their recognition. North Carolina did not fail in appreciation or application of federal standards of full faith and credit. Appropriate weight was given to the finding of domicil in the Nevada decrees, and that finding was allowed to be overturned only by relevant standards of proof. There is nothing to suggest that the issue was not fairly submitted to the jury and that it was not fairly assessed on cogent evidence.

"State courts cannot avoid review by this Court of their disposition of a constitutional claim by casting it in the form of an unreviewable finding of fact. *Norris v. Alabama,* 294 U. S. 587, 590. This record is barren of such attempted evasion. What it shows is that petitioners, long-time residents of North Carolina, came to Nevada, where they stayed in an auto-court for transients, filed suits for divorce as soon as the Nevada law permitted, married one another as soon as the divorces were obtained, and promptly returned to North Carolina to live. It cannot reasonably be claimed that one set of inferences rather than another regarding the acquisition by petitioners of new domicils in Nevada could not be drawn from the circumstances attending their Nevada divorces. It would be highly unreasonable to assert that a jury could not reasonably find that the evidence demonstrated that petitioners went to Nevada solely for the purpose of obtaining a divorce and intended all along to return to North Carolina. Such an intention, the trial court properly charged, would preclude acquisition of domicils in Nevada. See *Williamson v. Osenton,* 232 U. S. 619. And so we cannot say that North Carolina was not entitled to

draw the inference that petitioners never abandoned their domicils in North Carolina, particularly since we could not conscientiously prefer, were it our business to do so, the contrary finding of the Nevada court."

The factual situation here is quite similar to that in the *Williams* case. Appellant and her new found sweetheart enjoyed a pre-honeymoon trip to Nevada. Arriving in that state, appellant stayed in an auto camp. Ruff went to Los Angeles, California, with the evident purpose of preparing a home. Just as soon as she had been in Las Vegas six weeks, appellant filed her action for divorce and went to Los Angeles, where she stayed until her divorce case was ready for trial and then, on the same day that she received her decree, married Ruff. As soon as they were married, they went to Los Angeles. Her statement that she went to Nevada to find work and get a divorce, is only true in part. She did go there to secure a divorce, but there is no evidence that she attempted to secure work in that state. In any event, her statement, if true, did not evidence an intention to make a home in Nevada.

■ Domicile has a larger meaning than an expressed desire to find work and get a divorce. That this is true is clear from the definitions of domicile as approved by this court in the *Dormitzer* case. There it is written:

"*Carpenter v. Carpenter*, 30 Kan. 717 [712] (46 Am. Rep. 108, 2 Pac. 122).

" 'The difficulty of defining accurately the term "domicile" is generally conceded by both the courts and the text writers. The following definition, framed by an eminent authority, has, however, been frequently approved, and is probably the best that can be given. "In a strict and legal sense, that is properly the domicile of a person where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning." ' 10 Am. & Eng. Enc. Law (2d ed.), 7, and cases cited.

"And in note, Kent's definition:

" 'The place where a man carries on his established business or professional occupation, and has a home and permanent residence, is his domicile.' 2 Kent, Commentaries, 431.

"And in note:

" 'The Roman codes described domicile as follows: "In whatever place an individual has set up his household gods and made the chief seat of his affairs and interests; from which, without some special avocation, he has no intention of departing; from which, when he has departed, he is considered to be from home; and to which, when he has returned, he is considered to have returned home—in this place there is no doubt whatever he has his domicile." ' *White v. Brown*, 1 Wall. Jr. 262."

█ It is our conclusion that the trial court did not commit error, when it took evidence relative to the domicile or residence of appellant, at the time she started her divorce proceedings in the state of Nevada. We hold that appellant never became a resident of the state of Nevada; that the Nevada court did not obtain jurisdiction to entertain the action for divorce; and that its decree was entirely void.

█ The next question relates to a promissory note for five thousand dollars given by respondent to his father. The consideration for the note was various loans and advancements made by respondent's father, during the years from 1927 to 1939. All of the sums obtained by respondent were used by him for the improvement of the farm owned by the community, and in the conducting of the farming activities. Appellant contends that the debts were barred by the statute of limitations, and that the note given by respondent was not given to facilitate any business transactions of the community.

The decision of this question is controlled by *Catlin v. Mills,* 140 Wash. 1, 247 Pac. 1013. The facts in that case were these: A husband and wife gave a mortgage on community property. The note secured by the mortgage was signed November 7, 1899, and was due November 7, 1904. Certain endorsements of payments were made in 1914 and 1920. It was contended that the payments so made by the husband were made after the running of the statute of limitations, and ". . . could only result in continuing the obligation against him individually, and would not have any effect as against the community." In passing, this court referred to the statutes Rem. Comp. Stat., §§ 6892, 6893, now Rem. Rev.

Stat., §§ 6892, 6893 [P. P. C. §§ 434-27, 434-29], which provide that the husband shall have the management and control of the community personal and real property, and then held that the acts of the husband in making the payments on the note were for the community benefit and therefore bound it to the obligation evidenced by the note. We adhere to the conclusion to which we have just referred, and hold that the trial court in this case was correct in deciding that the note given to respondent's father was an obligation of the community.

■ The next claim of error calls in question the ruling of the trial court in allowing respondent to refer to a memorandum relative to the loans made by his father. The memorandum in question was prepared by respondent a short time before the trial. In *Bergman v. Shoudy*, 9 Wash. 331, 37 Pac. 453, this court held that the use of a memorandum similar in character to the one used in the trial of this case, constituted reversible error. However, in that case, the cause was tried to a jury, while here the trial was to the court. We cannot presume that the trial court, in the instant case, considered the inadmissible testimony when arriving at its decision. Hence, the error does not compel a reversal of this case.

■ Appellant challenges the court's actions in the distribution of the community property. The court gave to appellant the sum of $5,200.50, together with the sum of $300 which she took with her when she left the state of Washington. The balance of the property was given to respondent.

The findings of fact and conclusions of law and the interlocutory order do not indicate the basis of the division of the property. Our statute, Rem. Rev. Stat., § 989 [P. P. C. § 23-23], provides:

"Decree—Disposition of property. In granting a divorce, the court shall also make such disposition of the property of the parties as shall appear just and equitable, having regard to the respective merits of the parties, and to the conditions in which they will be left by such divorce, and to the party through whom the property was acquired, and to the bur-

dens imposed upon it for the benefit of the children, and shall make provision for the guardianship, custody, and support and education of the minor children of such marriage."

The questions relative to the disposition of property in a divorce action, rest largely in the discretion of the trial court, and its judgment will not be disturbed except in those cases where we can say that the court abused its discretion and made an inequitable division of the property. The trial court in this case did not abuse its discretion in any way. We are of the opinion, after a study of the facts contained in the record, that the court was quite liberal in making the cash award to appellant.

 The appellant challenges the refusal of the trial court to allow her certain attorney's fees. The court allowed the appellant the sum of "$300.00 to take an appeal of this cause to the supreme court of the state of Washington," but refused to make further allowances as demanded by appellant.

The trial court has the discretion as to allowance of attorney's fees and suit money to a wife, after a divorce has been granted to her husband. *Lehrman v. Lehrman,* 183 Wash. 649, 49 P. (2d) 41.

The court properly exercised its discretion, and we will not disturb its decision.

 Finally, appellant urges error on the part of the trial court in refusing the application of Donald Mapes for a change of custody to a neutral party. The application was made subsequent to the entry of the interlocutory order. We cannot consider this claim of error for the reason that the application was made after an appeal had been taken to this court from the order entered in the divorce proceedings. The trial court was without jurisdiction to consider the application for change of custody of Donald Mapes, pending appeal to this court. *Pike v. Pike, ante* p. 735, 167 P. (2d) 401.

The judgment is affirmed.

DRIVER, C. J., MILLARD, and STEINERT, JJ., concur.

MALLERY, J., dissents.