[No. 67254-1-I.  Division One.  November 5, 2012.]

*In the Matter of the Marriage of* MARGARET DAVID-OYTAN, *Respondent*, and KUDRET OYTAN, *Appellant*.

*Catherine Wright Smith* and *Valerie A. Villacin* (of *Smith Goodfriend PS*), for appellant.

*Jennifer J. Payseno* (of *McKinley Irvin*); and *Kenneth W. Masters* and *Shelby R. Frost Lemmel* (of *Masters Law Group PLLC*), for respondent.

¶1 SCHINDLER, J. — Kudret Oytan contends the Washington State superior court did not have the authority to exercise personal jurisdiction over him in this dissolution because he was not "[l]iving in a marital relationship within this state" under the long-arm statute, RCW 4.28.185(1)(f). He contends that because he was not a resident, the limited contacts necessary for jurisdiction are not established, and jurisdiction lies only in Turkey. He also contends the court did not have jurisdiction because the long-arm statute service requirements were not met.

¶2 But the parties never lived in a marital relationship in Turkey, and neither the statute nor due process requires that a now-absent dissolution respondent lived full time in Washington during the marriage. Because the court's exercise of jurisdiction satisfied both the statute and due process, we affirm. We also affirm the court's refusal to vacate its temporary order for child support.

## FACTS

¶3 Kudret Oytan and Margaret David-Oytan met in Ankara, Turkey, in 1993. Kudret worked as a diplomatic officer in the Turkish Ministry of Foreign Affairs. Margaret worked as a lawyer with the United Nations. In 1996, Kudret was posted to the Turkish Consulate in Los Angeles and on November 29, 1997, Kudret and Margaret were married in Maryland. Margaret and Kudret have dual United States and Turkish citizenship.

¶4 Kudret and Margaret lived in Los Angeles from 1997 until January 2007, and purchased a home and several investment real estate properties. Margaret worked as an immigration lawyer. Kudret testified that Margaret "did not want to accompany me in my job anywhere else in the world as it would hurt her career as a lawyer and insisted we stay in the USA together." Their daughter, A.O., was born on March 26, 1999.

¶5 In 1999, Kudret took a leave of absence from the Turkish Ministry of Foreign Affairs and enrolled at University of Southern California, earning a master's degree in business administration in 2000. He obtained a job as a product manager for an Internet startup company. After 2001, Kudret worked as a financial adviser with Morgan Stanley.

¶6 According to Kudret, he and Margaret "talked and agreed that maybe I should go back to my career in diplomatic service. Economy was still bad after a big financial meltdown and stable financial jobs were not around." In 2004, Kudret returned to work for the Turkish Ministry of Foreign Affairs in Ankara, Turkey. Margaret and A.O. continued to live in Los Angeles, and Kudret returned to Los Angeles as frequently as possible. Margaret testified that she and Kudret "maintained our relationship" while he worked in Turkey. Kudret said that "[d]espite being apart, we were a devoted couple." In 2004, Kudret and Margaret

purchased a home in Alexandria, Virginia, near Margaret's family. They discussed the possibility of working in Washington, D.C., but continued to live in Los Angeles. In 2005, Margaret and A.O. spent some time with Kudret in Turkey.

¶7 In 2006, they decided to move out of Los Angeles. Margaret started looking for a new job. Kudret sent her information about a position as an immigration attorney at Microsoft in Washington and "encouraged [her] to apply for the position." After Margaret's interview with Microsoft in October, Kudret talked to the recruiter and was the first to learn that Microsoft planned to offer her the job. Kudret made suggestions to Margaret about negotiating the terms of the employment agreement. They decided to move the family to Washington. Margaret testified:

> Kudret and I extensively discussed whether we should make the move to Washington and we extensively discussed the job offer. We both wanted to move our family out of Los Angeles[,] which we agreed was not a good place to raise a family. We jointly decided that I would accept the position at Microsoft Corporation, and we jointly decided to move our family to King County, Washington.
>
> . . . .
>
> When I was offered the position at Microsoft, Kudret and I decided as a couple to make the move to Washington. We were committed to making our relationship work, despite the distance.

¶8 In January 2007, Kudret, Margaret, and A.O. drove from Los Angeles to Washington. They first lived in temporary Microsoft housing in Redmond. They enrolled A.O. in public elementary school. School records list Kudret as A.O.'s father, the head of the household, and the primary contact, using the Redmond telephone number and local Redmond address. Kudret took A.O. to her first day of school on January 22 and continued to be actively involved in A.O.'s education and school activities. At the end of January, Kudret left to go back to work in Turkey but returned to Redmond at the beginning of June. In July,

Kudret and Margaret went to Los Angeles to finish packing, after which Kudret stayed in Los Angeles to rent their house and supervise the move to Washington. When temporary housing ended, Kudret found a house for them to rent in Bellevue.

¶9 In August 2007, Kudret was posted to the Turkish Embassy in Minsk, Belarus. Kudret testified that "[l]iving together in Belarus was not even an option due to environmental cancer risk and non[-]availability of international schools. US economy had financial meltdown and jobs were scarce." Kudret's long separations from the family were difficult for A.O. In an e-mail dated February 14, 2007, Kudret insisted Margaret made "sure that [A.O.] understands we love each other and these separations are for business reasons." Meanwhile, Kudret said that he "was trying to be posted to the US or Canada so we could be close."

¶10 In 2008, Kudret and Margaret sold real estate investment property in Los Angeles, including their house and condominium units they had developed with a partner. Kudret told Margaret to transfer $1.5 million from those sales to an account with Akbank in Turkey. Kudret started working with a real estate agent in Bellevue to find houses either for the family or for investment purposes.

¶11 In October 2008, Kudret contacted an agent about purchasing a franchise business. Kudret provided some financial information to the agent and stated, "I have the cash and financial ability to complete a purchase if I find the right business at the right price. As you may see, the cash in the account was over $1500000 in only one account."

¶12 In November, Kudret sent an e-mail to the agent, asking him to focus on finding business opportunities in the Seattle area. Kudret states that he was "looking at businesses in the area" and saw one in Redmond, "which is close to where my family and I live."

I was offline for sometime. Not because I lost interest in buying a franchise but about where my wife and I would like to be. I

was in Washin[g]ton with my family and I talked with my wife and daughter .. In this economic crisis my wife has [a] good job in Seattle as an attorne[y] and my daughter loves her schooll [sic]. We decided to stay in the area and [not] move untill [sic] the economy gets better. Thus I was looking at businesses in the area.[1]

¶13  In 2009, Kudret was posted to the Turkish Ministry in Montreal, Canada, and was "able to see my wife and my daughter more often (a couple weeks a month)." Kudret's friend Bunyamin Ben Yazici testified that working "in different cities due to their careers and jobs . . . has been very difficult" for Kudret and Margaret. Yazici testified that he talked to Kudret "multiple times" after Kudret was posted to Canada about Kudret's finding a job in Washington.

[Kudret] expressed how difficult it was to be away from Meg and [A.O.] and that he was looking for a business opportunity in Washington in order to quit his current job. He asked me to keep an eye on any job opportunities for him. He also asked me to check with our mutual friend, Atilla Kilic, a business owner, for any business opportunities. Unfortunately, the current economic circumstances present difficult times to find readily available job opportunities.

¶14  In August 2009, Margaret sent an e-mail to Kudret about his request to transfer an additional $460,000 to Akbank. Margaret asked Kudret to confirm he would send the money in the Akbank account "back to the US." In response, Kudret reassured Margaret that "[t]he money and the properties are commonly ours . . . I do no[t] understand why you ask as I never claimed otherwise."[2] Kudret told Margaret that he wanted the money "in Turkey in a high interest bearing ac[c]ount with both our name[s] where both of us have a say."

¶15  In May 2010, Margaret and A.O. went to Montreal to visit Kudret. On June 7, 2010, Margaret filed a petition for

---

[1] (Ellipsis in original.)

[2] (Ellipsis in original.)

dissolution and "Petition for Order for Protection." She sought a temporary order for child support and parenting plan, an order appointing a guardian ad litem (GAL), and an order restraining Kudret from withdrawing money from bank accounts in the United States and Turkey.

¶16 In her declaration, Margaret described a history of threats and domestic violence beginning in 2000. She states that in 2000, Kudret began drinking heavily. He slapped her in the face, and for the first time he threatened that if she ever left him, he would "get a gun, kill me and [A.O.] and then kill himself." She stated that the most recent incident of physical abuse occurred in July 2008, "the evening before Kudret was returning to Europe."

> Kudret slapped me hard across the face. I started crying and tried to calm him down. We sat on the sofa. Kudret turned to me in anger, raised his leg and kicked me in the hip and thigh at least twice. I was in pain and my face was swollen and bruised. The bruises on my thighs took several weeks to heal. I have photos of the bruises and an e-mail from Kudret admitting that he hit me.

¶17 Margaret declared that she asked Kudret to stay away, but he had told several friends that he planned to come to Seattle. Based on his behavior in Montreal in May, Margaret states she was fearful Kudret would "become physically abusive again" and made arrangements to serve Kudret while he was visiting her sister in Virginia:

> I am fearful now because Kudret is in the U.S. in the Washington, D.C. area and has told several people that he is coming to Seattle to see me and our daughter even though I have asked him not to come here. The last time I saw him in May 2010 in Montreal, Canada, he was getting increasingly agitated, irritated, angry and verbally abusive. His behavior reminded me of past times when he had been physically abusive and I am afraid that he will become physically abusive again.

¶18 On June 8, 2010, a process server served Kudret in Virginia. Kudret then filed a divorce action in Turkey, a

motion to dismiss the petition for lack of personal jurisdiction, and a declaration in which he denied ever threatening Margaret. His declaration states that during the argument the couple had in July 2008, he was defending himself "and pushed [Margaret] away multiple times. When I was pushing against her . . . I hit her unintentionally in defense."

¶19 On July 15, 2010, a superior court commissioner entered a temporary protection order, finding by a preponderance of the evidence that Kudret subjected Margaret to domestic violence over the course of the marriage, and that based on previous assaults, her fear was reasonable. The temporary order limited Kudret's visitation with A.O. to supervised visits until he obtained a domestic violence assessment, and an alcohol and substance abuse assessment, but allowed Kudret to contact A.O. by e-mail.

¶20 The order also required both parties to refrain from transferring or concealing property, and directed Kudret to disclose information and provide a complete accounting of the funds in Turkey by July 30:

Accounting of Funds.

Respondent shall, on or before 7/30/10:

   a. disclose to the Petitioner and her counsel the name and address of the institution and/or location where the funds are held, the location of the funds, and current account numbers for all accounts currently holding the parties' ~$1,500,000 (oppose) and $468,073.87 (oppose), funds previously held with Akbank in Ankara, Turkey.

   b. provide a complete accounting—of any and all funds dissipated and/or otherwise consumed or used from the parties' ~$1,500,000 and $468,073.87 from May 1, 2010 through the date of the return of the funds.

¶21 The court commissioner entered an "Agreed" temporary order of child support that required Kudret to pay Margaret $615 a month for A.O.'s support. Kudret's attorney objected to entry of the order with "respect to property division and federal tax return on jurisdictional grounds."

¶22 Kudret retained new counsel and filed an amended motion to dismiss for lack of jurisdiction on the grounds that he was never a resident of Washington, stating that he only visited Margaret and A.O. "[a]fter Margaret moved to Washington," but he never lived here. Kudret asserted that only Turkey had jurisdiction.

> I have filed for divorce in Turkey where Margaret and I are both citizens. Since I am a diplomat with diplomatic immunity, per the 1962 and 1964 Vienna Conventions, Canada does not have jurisdiction over me or my property. Thus, Turkey is the only state that has jurisdiction over me personally.

In opposition, Margaret filed a declaration describing their decision to move as a family to Washington, a detailed description of Kudret's contacts with the family and Washington, and the history of domestic violence.

¶23 Kudret also filed a motion to vacate the temporary order of child support, again arguing he was not a resident of Washington and also claiming Margaret did not file an affidavit of service as required under the long-arm statute. In addition, Kudret argued the temporary child support order should be vacated under CR 60(b)(11) because his previous attorney was not authorized to enter into the order.

¶24 Margaret responded with a copy of Kudret's declaration stating, "Child Support – For the purpose of establishing temporary child support, I will stipulate to Meg's support calculation."

¶25 On October 14, the trial court ruled jurisdiction over Kudret was established under the long-arm statute, RCW 4.28.185(1)(f), because Kudret lived in a marital relationship with Margaret in the state of Washington:

> The Respondent ("father") lived in a marital relationship with the petitioner ("mother") within the State of Washington. They together established a family home in the State of Washington. They have lived in the State of Washington as husband·and wife. The father agreed to their move to the State of Washing-

ton as a family. He was personally involved in the decision that the wife pursue and accept employment in the State of Washington, and that the family home be moved to Washington so that the wife could work and contribute to the support of the family. The father, throughout the marriage, has often been employed and worked in locations far removed from the family homes the mother and father have maintained. When he had time available from his professional obligations in other locations within and outside the United States of America, he has regularly returned to the marital home in the State of Washington. This is sufficient to exercise personal jurisdiction pursuant to RCW 4.28.185(1)(f).

¶26 The court also concluded that because Kudret owned personal and community property in the state, secured insurance in the state, and engaged in sexual relations with Margaret in the state, there was jurisdiction under RCW 4.28.185(1)(c), (d), and (e).

¶27 Further, the court ruled that "equity requires that all issues be resolved within the State of Washington. . . . Both parties have substantial connections with Washington State and it would not prejudice either party to litigate in Washington State, in light of the substantial connections." The court concluded that Margaret would be prejudiced if she was forced to litigate in Turkey or "any other jurisdiction," and found that "[t]here is no family home in Turkey or in any other state of the United States. All factors considered, neither party will be prejudiced if this matter is resolved in Washington State."

¶28 Following the ruling on the motion to dismiss, the superior court commissioner entered an order denying Kudret's motion to vacate the temporary child support order. The commissioner concluded Kudret did not establish grounds to vacate under CR 60(b)(11) and Margaret complied with the service requirements under RCW 4.28.185(4).

The parties submitted declarations for the hearing. The evidence before the court demonstrated that service in state was

not possible. The court also finds that there was an exigent circumstance involving the need for a protection order.

¶29 The commissioner ordered Kudret to pay Margaret attorney fees and costs "associated with this Motion to Vacate in the amount of $2,863."

This amount [is] based on [RCW] 26.09.140. The Respondent has increased cost of litigation and has greater ability to pay based on the financial information before the court, including the prior record. The parties['] 1040 [tax return] for 2009 & the estimated $1.5 million in Turkey to which respondent has access and he has not complied with the court's prior order to disclose/return those funds and he has not sought to stay the order. Further he is not contributing child support.

¶30 Kudret sought discretionary review of the order denying his motion to dismiss and the order refusing to vacate the temporary order of child support, which we denied.

¶31 Trial was set for May 9, 2011. Kudret did not appear. Margaret submitted a proposed parenting plan and a proposed order of child support, and testified at length. She provided a summary of financial transactions during the marriage and a spreadsheet of the proposed division of assets and liabilities. Margaret introduced into evidence more than 160 exhibits, including the pleadings filed in the case, a financial declaration, financial documents and account statements, and the parties' tax returns from 2002 to 2009. The court also admitted a number of e-mails Kudret sent to Margaret, an account statement from Akbank in Turkey, wire transfer authorizations, and a 28-page report from the GAL.

¶32 Margaret testified about the parties' assets, investments, earnings, sale of real estate investments, and their tax situation. The 2009 joint tax return states that Kudret earned $100,000 but the income was excluded from gross income. The "Treaty-Based Return Position Disclosure" addendum to the tax return states Kudret works for the Turkish Ministry and is a resident of Turkey.

¶33 Margaret testified about the significant transfer of funds to Turkey and provided a summary of the "Source of Funds Transfers between U.S. and Turkey." After selling real estate investments in 2008, she transferred $1.5 million to Akbank in Turkey.

> I had transferred some of our communal funds over to Turkey because my husband wanted to have the money in Turkey rather than the U.S. because of the banking situation here at the time.

¶34 Margaret testified that she later learned that the account was only in Kudret's name. "[T]he first [account], the — the one with the larger amount, the $1.5 million, was in Kudret's name only, which I didn't know at the time." Margaret said that in August 2009, Kudret pressured her to send an additional $460,000 to Akbank in Turkey. But Kudret assured her that "it was our joint funds" and he would establish a joint account for the money. In late August, Margaret wired $460,000 to the Akbank joint account. Margaret presented evidence tracing the community funds received from the real estate investments and the funds transferred to Akbank.

¶35 Margaret said that after she filed the petition for dissolution on June 7, 2010, she sent the order "which froze the accounts in Turkey" to a banker at Akbank. The banker told Margaret that Kudret withdrew $1.5 million from the account on May 31, 2010, and that on June 3, Kudret's father, using a power of attorney, withdrew $468,073.87 and closed the Akbank account.

¶36 Margaret also testified about the history of domestic violence. Margaret said that the first time Kudret "went into [a] rage" and physically abused her was in 2000. She described his drinking and his threats to kill her, A.O., and himself with a gun if she ever left him. She said that "[w]ith the alcohol and with the mood swings, it was just, you know, very rocky to live with him." Over the course of "the next few years[,] every once in a while he would be physically

abusive, like slapping me. I remember one time he slapped me so hard across the ear that I heard ringing for about 24 hours." But Margaret said that afterwards, Kudret would always apologize and promise to "never do it again."

> [A]fter each time he hit me . . . we would talk about it and then he'd apologize and he'd say he'd never do it again. But then later when he would get angry and he'd say — he'd say things like, "I told you I'm not going to hit you again but you're pushing me." As if — so he would make it seem like I was the one who was causing him to lose control and hit me. And so it got to the point where he didn't even have to hit me to bring on this fear. He would just say things like "you're pushing me." You're — "you don't want to see what's going to happen next" or these sort of threats in between the times where he was actually physically violent.

¶37 Margaret testified about the incident that occurred in July 2008, and the court admitted photographs documenting her injuries.

> And so I was trying to reason with him but he just kept getting angrier and more and more angry. And he came very, very close to my face and was sort of very menacingly approaching me and yelling, screaming at me right into my face and that — that night my daughter saw this going on. She heard the screaming and she ran to her room and slammed the door. And he's just screaming, screaming, yelling, calling me names, criticizing me. And then he stepped back and swung his arm and hit me very hard on my left cheek. . . . He raised his right foot and kicked me in the thigh at least twice. And you know, he's very big, very strong guy and this really just hurt. I had bruises for days on my hip and thigh, and my cheek swelled up, and you could see the bruises.

In an August 2008 e-mail, Kudret admits he hit Margaret and has a drinking problem:

> I did hit you, and I was an idiot. Yet, as I told you, it was like trying to take someone in shock out of shock. Still was wrong. I hate myself when I do something like that. My intention is not

hurting you . . . . My drinking is a problem which I will solve. I am aware of that.[3]

¶38 The GAL report describes interviews with Margaret, Kudret, A.O., and several therapists, and concluded that Margaret's allegations of domestic violence and abuse of alcohol were corroborated. The GAL recommended the court impose restrictions in the parenting plan, order Kudret to participate in domestic violence and alcohol treatment, and order supervised visitation with A.O.

¶39 Margaret testified that she had incurred approximately $136,000 in attorney fees. But Margaret only asked the court to award her attorney fees for time spent in preparation for trial.

¶40 The court found that Margaret was credible, that Kudret had engaged in domestic violence, and that domestic violence and his alcohol abuse were grounds for a restriction on visitation. The court ordered Kudret to pay back child support and to complete domestic violence and substance abuse treatment, and limited visitation with A.O. The court ruled that the community property should be equally divided and that Margaret was entitled to $30,000 in attorney fees "on the basis of [Kudret's] intransigence."

> The Court finds that . . . the Turkey divorce proceeding [was] initiated by the Husband for the purpose of increasing the Wife's litigation fees and costs. The Husband has represented to the Guardian ad Litem that the laws in Turkey are less favorable to him. Assuming this is true, the Husband's only purpose in pursuing the Turkish divorce, to dismiss the Washington divorce, can be to require the Wife to unnecessarily incur substantial fees and costs engaging in 3 simultaneous legal proceedings. The Court finds that this constitutes intransigence and warrants an award of attorney's fees to the Wife.
>
> [T]he Husband . . . made no efforts to prepare for trial in this matter, thereby requiring the Wife to prepare all exhibits and documents for all assets—whether in her name or not—and placing 100% of the burden for trial costs on the Wife.

---

[3] (Internal quotation marks omitted.)

¶41 The court entered detailed findings of fact and conclusions of law, including the following:

The sum of $1,556,574 held by the Husband or on the Husband's behalf outside of the United States, previously held in an account at Akbank in Ankara Turkey in the Husband's name. These funds were accumulated during marriage as a result of investments. . . .

. . . The sum of $468,000 held by the Husband or on the Husband's behalf outside of the United States, previously held in an account in Akbank in Ankara Turkey in the parties' joint names. These funds were accumulated during marriage as a result of investments made by the parties during marriage.

¶42 The court entered a decree of dissolution, a parenting plan, a domestic violence protection order, a child support order, and judgment for attorney fees. In the decree, the court divided the community assets equally between Kudret and Margaret, and awarded Margaret all of the community assets located in the United States and a money judgment of $808,000.

## ANALYSIS

*Personal Jurisdiction*

¶43 Kudret concedes the court had jurisdiction to enter the decree of dissolution and the parenting plan.[4] Kudret contends the court did not have personal jurisdiction over him for purposes of dividing the assets and liabilities, entering the child support order, or requiring him to pay attorney fees. Because he has never been a resident of the state of Washington, Kudret asserts, the long-arm statute did not confer jurisdiction over him. Kudret also claims he did not have sufficient contacts with the state to satisfy due process and the court should have declined to exercise personal jurisdiction over him as a matter of equity.

---

[4] We accept the concession as well taken. *See* RCW 26.27.201(1)(a); *Ghebreghiorghis v. Dep't of Labor & Indus.*, 92 Wn. App. 567, 573-74, 962 P.2d 829 (1998).

### 1. *Long-Arm Statute*

¶44 Extending the jurisdiction of Washington courts to persons outside its borders is chiefly accomplished under the long-arm statute, RCW 4.28.185. The statute is intended to operate to the fullest extent permitted by due process. *In re Marriage of Yocum*, 73 Wn. App. 699, 703, 870 P.2d 1033 (1994). Both the statutory requirements of RCW 4.28.185 and due process must be satisfied. *Yocum*, 73 Wn. App. at 702. The party asserting jurisdiction under the long-arm statute has the burden of establishing its requirements by "prima facie evidence." *John Does v. CompCare, Inc.*, 52 Wn. App. 688, 693-94, 763 P.2d 1237 (1988); *Yocum*, 73 Wn. App. at 703.

¶45 Where, as here, the court considers matters outside the pleadings in ruling on a motion to dismiss for lack of jurisdiction, we treat the motion as a motion for summary judgment. *Does*, 52 Wn. App. at 693. Consequently, the facts and reasonable inferences are reviewed in the light most favorable to Margaret as the nonmoving party. *Does*, 52 Wn. App. at 693.

¶46 Dissolution actions in Washington courts proceed under chapter 26.09 RCW. As to such actions, the long-arm statute provides, in pertinent part:

(1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person . . . to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:

. . . .

(f) Living in a marital relationship within this state notwithstanding subsequent departure from this state, as to all proceedings authorized by chapter 26.09 RCW, so long as the petitioning party has continued to reside in this state or has

continued to be a member of the armed forces stationed in this state.

RCW 4.28.185.[5]

¶47 At issue here is the phrase "living in a marital relationship within this state." The phrase is not defined in the statute, and Washington courts have not interpreted its meaning.

¶48 The meaning of a statute is a question of law reviewed de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). The court's objective is to ascertain and carry out the legislature's intent. *Campbell & Gwinn*, 146 Wn.2d at 9-10. To determine legislative intent, we first look to the language of the statute. If the statute is unambiguous, we determine legislative intent from the plain language of the statute as written. *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002). Examining the particular provision of a statute, as well as other statutory provisions in the act, is appropriate to decide whether a plain meaning can be ascertained. *Campbell & Gwinn*, 146 Wn.2d at 10.

¶49 Statutory provisions must be read in their entirety and within the context of the statutory scheme as a whole. *ITT Rayonier, Inc. v. Dalman*, 122 Wn.2d 801, 807, 863 P.2d 64 (1993). We must give meaning to every word in a statute. *In re Recall of Pearsall-Stipek*, 141 Wn.2d 756, 767, 10 P.3d 1034 (2000). A statute should be construed to effect its purpose, and "unlikely, absurd or strained consequences should be avoided." *State v. Stannard*, 109 Wn.2d 29, 36, 742 P.2d 1244 (1987). The court must interpret statutes to give effect to all language used, rendering no portion meaningless or superfluous. *City of Seattle v. State*, 136 Wn.2d 693, 698, 965 P.2d 619 (1998).

---

[5] The legislature amended RCW 4.28.185 in 2011 to add the words "or her" after "his" and "him" throughout the statute. Laws of 2011, ch. 336, § 100.

¶50 Kudret maintains that "living in a marital relationship" has the same meaning as "residence, domicile and place of abode." For this proposition he relies on *Freund v. Hastie*, 13 Wn. App. 731, 734, 537 P.2d 804 (1975).

¶51 But the *Freund* court did not address the long-arm statute. The issue there was the requirement in article VI, section 1 of the Washington Constitution that a candidate for elected office be a resident of the state: a person must have "lived in the [state,] county[, and precinct] 30 days immediately preceding the election at which he offered to vote." *Freund*, 13 Wn. App. at 733-34. The court held that "lived in" as used in the constitution "is the same as residence, domicile and place of abode." *Freund*, 13 Wn. App. at 734.

¶52 *Freund* is inapposite. Residency requirements for candidates for public office have an entirely different purpose and are not similar to requirements for the exercise of long-arm jurisdiction.

¶53 Our long-arm statute, RCW 4.28.185(1)(f), extends Washington jurisdiction to "[a]ny person [who meets certain criteria], *whether or not a citizen or resident of this state*." (Emphasis added.) Where there has been a marital relationship within the state, the petitioning party must be a resident, whereas the respondent must merely have been previously living here in a marital relationship. The legislature thus drew a distinction between residency and the act of living in a marital relationship. There are many varieties of marital relationships, and long-distance arrangements are common. The legislature did not define "living in a marital relationship" but clearly viewed it as distinct from residency—a feature of the statute Kudret would like us to ignore.[6] What constitutes living in a marital relationship is thus a question to be answered by

---

[6] "[W]hen 'different words are used in the same statute, it is presumed that a different meaning was intended to attach to each word.'" *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 160, 3 P.3d 741 (2000) (quoting *State ex rel. Pub. Disclosure Comm'n v. Rains*, 87 Wn.2d 626, 634, 555 P.2d 1368 (1976)).

the facts in the case. Certainly, past full-time residency satisfies the statute. But the statute does not require it.

¶54 Kudret relies on *In re Marriage of Corrie*, 32 Wn. App. 592, 648 P.2d 501 (1982), and *In re Marriage of Myers*, 92 Wn.2d 113, 594 P.2d 902 (1979), which also do not support his argument.

¶55 *Myers* principally involved a question of subject matter jurisdiction. The court announced its disapproval of the domicile rule in child custody disputes and held that if personal jurisdiction exists over both parents, subject matter jurisdiction exists over the question of custody. *Myers*, 92 Wn.2d at 115-16. Thus, a subsidiary issue in that case was whether the father was subject to personal jurisdiction in Washington. Because he had lived in Washington for three years before taking the children and fleeing to Kentucky, jurisdiction was properly obtained under the long-arm statute. *Myers*, 92 Wn.2d at 115. No issues relevant to this case were considered in *Myers*.

¶56 *Corrie* is similarly unhelpful. *Corrie* involved an interstate custody dispute, including a question of personal jurisdiction over a nonresident father for purposes of an award of attorney fees. The court simply held that "[a]lthough Mr. Corrie was no longer a Washington resident, for purposes of enforcing the dissolution decree, personal jurisdiction was obtained." *Corrie*, 32 Wn. App. at 597.[7]

¶57 Kudret also relies on a Kansas case, *Perry v. Perry*, 5 Kan. App. 2d 636, 623 P.2d 513 (1981), addressing a similar long-arm statute. The Kansas court found that the wife never " 'lived in the marital relationship' " in Kansas because she only visited the state twice—once en route to her husband's military posting in Hawaii and once to visit her

---

[7] *In re Marriage of Strohmaier*, 34 Wn. App. 14, 659 P.2d 534 (1983), and *Mapes v. Mapes*, 24 Wn.2d 743, 167 P.2d 405 (1946), are also inapposite. In *Strohmaier*, a husband challenged the venue of the dissolution action, arguing his spouse did not " 'reside' " in the county as required by statute. *Strohmaier*, 34 Wn. App. at 15-16. In *Mapes*, the court held that a Nevada dissolution petition brought by the wife was invalid because the wife's domicile or permanent residence was not in Nevada at the time of filing. *Mapes*, 24 Wn.2d at 754-55.

mother-in-law. *Perry*, 5 Kan. App. 2d at 639. The court held that "[t]he term 'lived in the marital relationship' is the equivalent of 'established a marital domicile.'" *Perry*, 5 Kan. App. 2d at 639.[8]

¶58 But, as established above, the facts here are quite different, and long-arm jurisdiction is a question of the particular individual's contacts with the forum state and depends upon the "quality and nature" of those activities. *Does*, 52 Wn. App. at 697 (citing *Nixon v. Cohn*, 62 Wn.2d 987, 994, 385 P.2d 305 (1963)). There is no black-and-white answer—" '[t]he greys are dominant and even among them the shades are innumerable.'" *Kulko v. Superior Court*, 436 U.S. 84, 92, 98 S. Ct. 1690, 56 L. Ed. 2d 132 (1978) (quoting *Estin v. Estin*, 334 U.S. 541, 545, 68 S. Ct. 1213, 92 L. Ed. 1561 (1948)).

¶59 In sum, Kudret helped his wife obtain a job here, moved his family here from Los Angeles, established a family home here, owns personal property here, actively sought business opportunities here, placed his daughter in school here and was active in her school activities, received medical care here, registered his car and had insurance here, holds himself out as living here, and returned here whenever he was not working. This was the only family home. It is not contended Kudret lived anywhere else in such a relationship. And there is certainly no evidence whatsoever that he lived with Margaret in a marital relationship in Turkey.

---

[8] However, a decade later, the court held that "[t]he scope of in personam jurisdiction for issues arising out of the marital relationship for those obligations covered by [the long-arm statute] is to be determined by constitutional limitations and does not contain an additional requirement to establish a marital domicile." *In re Marriage of Brown*, 247 Kan. 152, 162, 795 P.2d 375 (1990). The court further held that "the question in determining whether in personam jurisdiction is appropriate in these cases should be whether the absent defendant lived in a marital relationship within the state to an extent sufficient to meet the constitutional minimum contacts requirements of *Internat[ional] Shoe Co. v. Washington*, 326 U.S. 310[, 66 S. Ct. 154, 90 L. Ed. 95 (1945)]." *Brown*, 247 Kan. at 162.

¶60 Because Kudret lived in Washington in a marital relationship, the court has jurisdiction under the long-arm statute.

## 2. *Due Process*

¶61 Jurisdiction under the long-arm statute must satisfy due process. *See Yocum*, 73 Wn. App. at 703. In *Tyee Construction Co. v. Dulien Steel Products, Inc.*, 62 Wn.2d 106, 115-16, 381 P.2d 245 (1963), the Washington State Supreme Court set out the necessary requirements to exercise personal jurisdiction over a nonresident defendant, which must be met in order to comport with the due process clause of the Fourteenth Amendment:

> (1) The nonresident defendant . . . must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.[9]

¶62 The requirements set forth in *Tyee* embody the "minimum contacts" test under *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). The facts of each case must be weighed to determine whether sufficient " 'minimum contacts' " have been shown. *Kulko*, 436 U.S. at 92 (quoting *Int'l Shoe*, 326 U.S. at 316). It is the "quality and nature of the defendant's activities" that determine if the contact is sufficient, "not the number of acts or mechanical standards." *CTVC of Haw. Co. v. Shinawatra*, 82 Wn. App. 699, 707, 919 P.2d 1243 (1996).

¶63 Kudret relies on *Kulko* to argue that his acquiescence in Margaret's "unilateral decision" to relocate to

---

[9] (Footnotes omitted.)

Washington cannot be a basis for the court's exercise of jurisdiction. This case is not like *Kulko*.

¶64 In *Kulko*, the parties lived in New York State during the marriage. After they divorced, the mother lived in California and the parties' two children remained with their father in New York. *Kulko*, 463 U.S. at 86-87. Later, both children decided they would rather live with their mother in California, and she filed an action in California seeking to modify the custody arrangements and to increase child support. *Kulko*, 463 U.S. at 87-88. The father moved to quash service of the summons, arguing that he did not have the necessary "minimum contacts" with California. *Kulko*, 436 U.S. at 88. His only contacts with California were two short stopovers during his time in the military and his agreement that one of the children could move to California to live with her mother. *Kulko*, 436 U.S. at 93.

¶65 The Supreme Court held that the father's "glancing presence" on two occasions in California did not confer personal jurisdiction over him, and his consent to one daughter's change of residence did not " 'purposefully avail[ ] [him] of the privilege of conducting activities within [California]' " for purposes of the due process clause of the Fourteenth Amendment. *Kulko*, 436 U.S. at 92-94 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)). The Court emphasized:

> "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. . . . [I]t is essential in each case that there be some act by which the defendant purposefully avails [him]self of the privilege of conducting activities within the forum State."

*Kulko*, 436 U.S. at 93-94[10] (quoting *Hanson*, 357 U.S. at 253).

---

[10] (Alterations in original.)

¶66 In contrast, the record in this case supports the court's exercise of jurisdiction.[11] As the evidence described above establishes, the parties' decision to relocate here was not unilateral. The court found, and Kudret does not dispute, that Kudret was often working abroad but "regularly returned to the marital home" in Washington:

> The father, throughout the marriage, has often been employed and worked in locations far removed from the family homes the mother and father have maintained. When he had time available from his professional obligations in other locations within and outside the United States of America, he has regularly returned to the marital home in the State of Washington.

¶67 The record also establishes that Kudret frequently communicated with Margaret and A.O. by e-mail, video, and phone, participated in daily decisions, and remained active in A.O.'s education. He is listed as the primary contact at A.O.'s school, and he participated in school activities, including fundraisers. Kudret and Margaret opened a post office box in Redmond. All correspondence was sent there, including cellular telephone bills in Kudret's name, his life insurance policy statements, property tax and mortgage bills, credit card statements, and his University of Southern California alumni correspondence. Kudret also listed the Washington address on his United States passport. Kudret and Margaret jointly registered and insured their car in Washington; he helped maintain the household, including taking the family car for repairs; and he was named as one of the customers on the Puget Sound Energy bill for the home in Redmond. He and Margaret also filed joint tax returns using the Washington address.

---

[11] Likewise, *In re Marriage of Tsarbopoulos*, 125 Wn. App. 273, 104 P.3d 692 (2004), and *In re Marriage of Markowski*, 50 Wn. App. 633, 749 P.2d 754 (1988), are distinguishable. In *Tsarbopoulos*, after separation, the wife moved from Greece to Washington with the children and convened the dissolution proceeding. *Tsarbopoulos*, 125 Wn. App. at 279. In *Markowski*, after the parties separated, the wife moved to Washington. The husband continued to live in Oregon and only came to Washington to visit the children. *Markowski*, 50 Wn. App. at 634-35.

¶68 Kudret also took advantage of the health insurance Margaret provided for the family. He received medical care when he was in Washington, including doctor appointments, physical therapy, prescriptions, and, in 2008, treatment for back pain with several spinal injections. Further, in an e-mail in 2008, Kudret stated that he lived in Washington with his family and was looking for business opportunities in the Seattle area in order to "quit his job and be with his family."

¶69 Viewing the evidence in the light most favorable to Margaret, the record amply shows that Kudret lived in a marital relationship in Washington. The exercise of personal jurisdiction over Kudret does not "offend traditional notions of fair play and substantial justice." *Tyee*, 62 Wn.2d at 115-16.

¶70 Nor did equity require the court to decline to exercise personal jurisdiction over Kudret. Between 2007 and 2010, the parties lived in a marital relationship in Washington and nowhere else. Both parties had substantial connections to Washington, but Margaret had no connection to Turkey, the only jurisdiction Kudret proposed.[12]

*Service of Process*

¶71 Kudret also contends the court did not have personal jurisdiction over him because Margaret did not comply with the requirements of the long-arm statute. Kudret asserts that because Margaret did not file an affidavit showing service could not be made in Washington, the final orders are void. RCW 4.28.185(4) states that "[p]ersonal service outside the state shall be valid only when an affidavit is made and filed to the effect that service cannot be made within the state."

¶72 A court does not have jurisdiction over a defendant who is not properly served. *Powell v. Sphere*

---

[12] Because we conclude that the court had personal jurisdiction over Kudret under RCW 4.28.185(1)(f), we need not address jurisdiction under RCW 4.28-.185(1)(c), (d), and (e). However, we note Margaret concedes the court did not have personal jurisdiction under RCW 4.28.185(1)(e).

*Drake Ins. PLC*, 97 Wn. App. 890, 899, 988 P.2d 12 (1999). Substantial, rather than strict, compliance with RCW 4.28-.185(4) is permitted if " 'service cannot be made within the state.' " *Barr v. Interbay Citizens Bank of Tampa, Fla.*, 96 Wn.2d 692, 696, 635 P.2d 441, 649 P.2d 827 (1981) (quoting RCW 4.28.185(4)); *Powell*, 97 Wn. App. at 899.

¶73 The declarations Margaret filed in support of the protection order and in response to the motion to dismiss establish a history of domestic violence and her fear about effecting service on Kudret in Washington. The court did not err in concluding service within the state was not possible, and Margaret complied with the service requirements of RCW 4.28.185(4).

*Motion To Vacate the Temporary Child Support Order*

¶74 Finally, Kudret asserts the trial court erred in refusing to vacate the temporary order of child support because his attorney did not have authority to agree to the order. Kudret has the burden of showing that his attorney's agreement to the temporary order was a product of fraud or that the attorney overreached his authority. *Nghia Nguyen v. Sacred Heart Med. Ctr.*, 97 Wn. App. 728, 735, 987 P.2d 634 (1999). Here, the record establishes that Kudret stipulated to Margaret's calculation of child support for purposes of the agreed order.

¶75 Because the record establishes Kudret lived in a marital relationship in Washington State and the exercise of jurisdiction satisfies due process, we affirm.[13]

GROSSE, J., and ELLINGTON, J. PRO TEM., concur.

Reconsideration denied January 9, 2013.

Review denied at 177 Wn.2d 1017 (2013).

---

[13] We decline to award Margaret attorney fees on appeal under RCW 26.09.140.